CITY OF ELKO, Respondent,

v.

Emad ABED, et al., Appellants,

Albert LaFontaine, Defendant.

No. A03–1050.

Court of Appeals of Minnesota.

April 13, 2004.

James J. Thomson, Mary D. Tietjen, Kennedy & Graven, Chartered, Minneapolis, MN, for respondent.

Randall D.B. Tigue, Randall Tigue Law Office, P.A., Minneapolis, MN, for appellants.

Considered and decided by ANDERSON, Presiding Judge; STONEBURNER, Judge; and HUDSON, Judge.

## OPINION

HUDSON, Judge.

In 2001, the City of Elko City Council adopted Ordinance No. 92 establishing licensing requirements for sexually oriented businesses. In 2002, the City of Elko served and filed a summons and complaint seeking an injunction to enforce the ordinance against appellants, Sphinx Properties, L.L.C., and Circus Circus, L.L.C., who were operating an adult establishment that offered nude dancing. Both parties moved for summary judgment and the district court granted summary judgment to respondent City of Elko on all claims. On appeal, appellants challenge the constitutionality of the ordinance and argue that the ordinance is a licensing scheme that is a prior restraint on speech in violation of the First Amendment. Likewise, appellants argue that the disqualification and disclosure provisions, the license and investigation fees, the distance restrictions, and the prohibition against gratuities are all impermissible prior restraints on speech. We affirm.

## FACTS

On November 19, 1999, the Elko City Council adopted Ordinance No. 79, impos-

ing a temporary moratorium on new adult establishments in the city. The city council directed the city planner, Stephen Grittman, to review studies relating to the adverse effects of sexually oriented businesses. Grittman reviewed several studies relating to the impact of sexually oriented businesses on communities, including a report that contained information from studies conducted in Minneapolis, St. Paul, Phoenix, and Indianapolis. Copies of these studies were disseminated to both the planning commission and the city council. Grittman prepared a draft resolution and findings for the City of Elko planning commission and city council that outlined and summarized conclusions relating to the potential adverse secondary effects [1] that sexually oriented businesses would have within the city.

Based on findings in the draft resolution, on November 21, 2000, the planning commission recommended that the city council establish zoning and license controls to minimize secondary effects of sexually oriented businesses and provide those businesses a reasonable opportunity to locate and operate in the city. On December 4, 2000, the city council accepted that recommendation and adopted Grittman's draft resolution. Based on the findings in the resolution, on August 6, 2001, the city council adopted Ordinance No. 92, establishing licensing requirements for sexually oriented businesses.

Ordinance No. 92 prohibits the operation of a sexually oriented business within the city without first obtaining a sexually oriented business license. The ordinance sets forth the procedure for obtaining a license and also provides that individuals convicted of certain crimes are disqualified from licensure for a period of time. The ordinance authorizes the city council to set an annual license and investigation fee; the license fee was set at $5,000 and the investigation fee at $1,500. The ordinance also contains a distance requirement for dancers, and a requirement that no gratuity may be given to any semi-nude dancer or performer.

On December 21, 2001, appellant Sphinx Properties, L.L.C. (Sphinx), purchased a restaurant/bar in the city. Sphinx leased the property to appellant Circus Circus, L.L.C. (Circus Circus). Appellant Emad Abed (Abed) is the president and sole shareholder of both companies. Natalie Brisson (Brisson) is the vice president in charge of dance operations for Circus Circus. Brisson has been convicted of misdemeanor prostitution, thus the ordinance disqualifies her and Circus Circus from licensure for a period of time as long as she remains an officer of Circus Circus.

In September 2002, Sphinx and Circus Circus sued the city in federal district court alleging that the ordinance is unconstitutional. In October 2002, Albert LaFontaine acquired an interest in the property and claimed it was sovereign tribal land exempt from local ordinances and regulations and began offering nude dancing at the property. On November 1, 2002, the Elko police issued citations to three female dancers for dancing nude in violation of the ordinance, and issued a citation to a manager for serving alcohol while nude dancing was occurring, in violation of a separate ordinance. On November 8, 2002, the federal district court denied the city's motion for a temporary restraining order and suggested that any alleged violations of the ordinance should be heard in state court. On November 12, 2002, the city revoked Circus Circus's li-

1. The draft resolution, Resolution No. 23, identified potential adverse secondary effects including: increased crime rates (especially sex-related crimes), depression of commercial and residential property values, and increased transiency.

quor license for non-payment of license fees and delinquent property taxes. On November 14, 2002, special agents of the Minnesota Alcohol and Gambling Enforcement Division observed alcohol continuing to be served at the property.

On November 19, 2002, the city served and filed a complaint seeking an injunction to enforce Ordinance No. 92. On November 26, 2002, the district court issued a temporary injunction prohibiting appellants from, inter alia, operating a sexually oriented business without a license. At some point after the temporary injunction was issued, LaFontaine ceased to have an interest in the property.

On December 13, 2002, appellants filed an answer and counterclaim challenging the constitutionality of Ordinance No. 92. On February 25, 2003, appellants moved to dissolve the temporary injunction and sought an injunction prohibiting the city from enforcing the ordinance. The district court treated the motion and city's response as cross-motions for summary judgment on the merits.

On June 3, 2003, the district court denied appellants' motion for summary judgment and granted the city's motion, thereby concluding that Ordinance No. 92 is constitutional. This appeal follows.

## ISSUES

I. Did the district court err in holding that Ordinance No. 92 is a content-neutral time, place and manner regulation?

II. Did the district court err in holding that the provision providing for license disqualification based on prior criminal convictions of certain offenses is valid?

III. Did the district court err in holding that the disclosure requirements are valid?

IV. Did the district court err in holding that the license and investigation fees are valid?

V. Did the district court err in holding that the distance restrictions and prohibition of gratuities are valid?

## ANALYSIS

### I

Summary judgment is appropriate only where there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. On appeal from summary judgment, we examine two questions: "whether there are any genuine issues of material fact and whether the lower courts erred in their application of the law." *Cummings v. Koehnen,* 568 N.W.2d 418, 420 (Minn.1997). The facts are undisputed; therefore, this court's review is whether the district court erred in its application of the law. On appeal from a grant of summary judgment, we review questions of law de novo. *Christensen v. Eggen,* 577 N.W.2d 221, 224 (Minn.1998). "The constitutionality of an ordinance is a question of law, which this court reviews de novo." *State v. Botsford,* 630 N.W.2d 11, 15 (Minn. App.2001), *review denied* (Minn. Sept. 11, 2001). The party opposing summary judgment "must do more than rest on mere averments." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 71 (Minn.1997).

Appellants first argue that the district court erred in analyzing the constitutionality of Ordinance No. 92 under the more lenient time, place, and manner standard, because the ordinance is a prior restraint on speech, and as such, it carries a heavy presumption against its constitutional validity. Appellants further contend that even if Ordinance No. 92 is a time, place and manner regulation, in *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425,

122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), the United States Supreme Court heightened the evidentiary burden required to sustain such ordinances under the so-called secondary effects theory. Appellants argue that they cast doubt on the evidence the city used to support the adoption of the ordinance, and under the heightened evidentiary burden articulated in *Alameda Books,* the burden shifted to the city to produce additional evidence to sustain the ordinance. Appellants claim that the city did not meet its burden. The city counters that nude dancing establishments are only entitled to minimal protection under the First Amendment, and that the ordinance complies with the requirements the Supreme Court has established for regulating adult uses.

■■■ It is well established that regulations enacted for the purpose of restraining speech on the basis of content presumptively violate the First Amendment.[2] *See Carey v. Brown,* 447 U.S. 455, 462–63, and n. 7, 100 S.Ct. 2286, 2291, and n. 7, 65 L.Ed.2d 263 (1980). By contrast, a city may regulate a First Amendment-protected use if the ordinance is: (1) a content-neutral time, place, and manner regulation; (2) designed to serve a substantial governmental interest; and (3) which does not unreasonably limit alternative avenues of communication. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). Thus, the *Renton* test is less stringent than that for content-related restrictions, because content-neutral speech regulations are justified without reference to the content of the regulated speech.

But determining whether an ordinance is "content-based" or "content-neutral" is not always an easy task because certain ordinances do not fit neatly into either category. That is certainly the case with the City of Elko ordinance we are confronted with here. To be sure, the ordinance is enforced through a licensing scheme that prohibits certain expressive conduct (nude dancing), unless the establishment has obtained the appropriate license and satisfied various disclosure and disqualification provisions. As such, it is not a typical content-neutral zoning ordinance where, for example, a city has limited adult entertainment to a certain geographical area. Nevertheless, the ordinance does not ban nude dancing establishments altogether, and as the district court concluded, the ordinance is aimed not at the *content* of the "message" being conveyed by nude dancing, but rather at the *secondary effects* of nude dancing establishments on the surrounding community.

■■ Appellants forcefully argue that nude dancing is entitled to the same First Amendment protection afforded to core First Amendment activities and speech, such as, the production of newspapers, books, or films. But the United States Supreme Court has articulated what we believe is a dispositive distinction between the degree of First Amendment protection afforded to expressive conduct, such as nude dancing, and the degree of First Amendment protection afforded to other forms of speech and expressive conduct. For example, the Supreme Court has held that adult films and books receive complete First Amendment protection. *See*

---

2. U.S. Const. Amend. I provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, or to petition

the Government for a redress of grievances." The protections of the First Amendment are made applicable to the states by the Fourteenth Amendment. *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931).

*Alameda Books, Inc.,* 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (acknowledging a city ordinance regulating adult bookstores implicates First Amendment rights); *Jacobellis v. Ohio,* 378 U.S. 184, 187, 84 S.Ct. 1676, 1677, 12 L.Ed.2d 793 (1964) ("[m]otion pictures are within the ambit of constitutional guarantees of freedom of speech and of the press"). However, the Supreme Court has consistently stated that while nude dancing is entitled to some First Amendment protection, "it falls only within the outer ambit of the First Amendment's protection." *See City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (holding nude dancing is expressive conduct within the outer perimeters of the First Amendment, though only marginally so). Furthermore, the Supreme Court has noted that society's interest in this type of expression is different than its interest in non-sexually explicit expression. *See Young v. Am. Mini Theaters, Inc.,* 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (holding that it is manifest that society's interest in protecting this type of expression—sexually explicit materials—is of a wholly different and lesser magnitude than the interest in untrammeled political debate). The First Amendment parameters are admittedly not precise, but it is clear that nude dancing receives some lesser degree of First Amendment protection than adult films and adult books, or traditional political speech. Having established that the First Amendment only minimally protects nude dancing, our analysis now turns to whether Ordinance No. 92 is a valid time, place, and manner regulation, designed to serve a substantial governmental interest.

■ A city may regulate a First Amendment-protected adult entertainment establishment if the ordinance satisfies a three-prong test: the ordinance must be (1) a content-neutral time, place, and manner regulation; (2) designed to serve a substantial governmental interest; and (3) which does not unreasonably limit alternative avenues of communication.[3] *Renton,* 475 U.S. at 47, 106 S.Ct. at 928. We conclude that Ordinance No. 92 satisfies the three-prong test.

### 1. Content Neutral

■ The ordinance satisfies the first prong of *Renton* as it is content-neutral. The Court in *Renton* held that "content-neutral" regulations are those that "are *justified* without reference to the content of the regulated speech." *Renton,* 475 U.S. at 48, 106 S.Ct. at 929 (emphasis in original) (quotations omitted). In *Renton,* the Court concluded that the stated purpose of the ordinance was to address the secondary effects of adult businesses and not to suppress unpopular views; therefore the Court held the ordinance was content-neutral. *Id.*

Here, the purpose of Ordinance No. 92 is also to minimize the secondary adverse effects of sexually oriented businesses. The city council considered the relationship between sexually oriented businesses and the potential adverse effects on the community prior to adopting the ordinance. The city relied on studies that described other cities' experiences with adult businesses and their adverse secondary effects. In addition, the ordinance states on its face that it is to neither have the "purpose nor effect of imposing a limitation or restriction on the content of any communicative materials, including sexually oriented materials." The ordinance also provides that "it is not the intent nor effect

---

**3.** The third prong of the *Renton* test is not at issue in this appeal.

of this Ordinance to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market." We conclude that Ordinance No. 92 satisfies the first prong of the *Renton* test, as its purpose is to minimize the secondary adverse effects of sexually oriented businesses. Therefore, the district court correctly held that Ordinance No. 92 is a content-neutral time, place, and manner regulation.

### 2. Substantial Governmental Interest

█ The second prong of *Renton* requires that the ordinance be designed to serve a substantial governmental interest. The Supreme Court has recognized that cities have an interest in attempting to preserve the quality of urban life and that interest is one that must be accorded high respect. *See Am. Mini Theaters,* 427 U.S. at 71, 96 S.Ct. at 2453. Thus, the Court has held that combating the harmful secondary effects associated with nude dancing is a substantial governmental interest. *Renton,* 475 U.S. at 50, 106 S.Ct. at 930; *Erie,* 529 U.S. at 296, 120 S.Ct. at 1395. Furthermore, in demonstrating that secondary effects pose a threat, the city need not "conduct new studies or produce evidence independent of that already generated by other cities ... so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton,* 475 U.S. at 51–52, 106 S.Ct. at 931. But appellants argue that the Supreme Court's recent decision in *Alameda Books* heightened the *Renton* evidentiary standard. We disagree.

The primary issue in *Alameda Books* was the appropriate standard for determining whether an ordinance serves a "substantial government interest" under *Renton.* *Alameda Books,* 535 U.S. at 433, 122 S.Ct. at 1733. In *Alameda Books,* the Supreme Court rejected the Ninth Circuit's conclusion that a city must prove that the city's theory—in that case whether the adult· bookstore would result in damaging secondary effects to the community—is the only theory that can plausibly explain the data the city relies on. *Id.* at 438–39, 122 S.Ct. at 1735. To the contrary, in *Alameda Books,* the Court stated:

> [i]n *Renton,* we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest.

*Id.* at 438, 122 S.Ct. at 1736. Appellants, however, claim that the following language in *Alameda Books* heightened the *Renton* evidentiary standard:

> [t]his is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipalitys evidence does not support its rationale or by furnishing evidence that disputes the municipalitys factual findings, the municipality meets the standard set forth in *Renton.* If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books,* 535 U.S. at 438–39, 122 S.Ct. at 1736.

█ Appellants claim that under the "new" standard in *Alameda Books,* the

city must prove that the ordinance actually diminishes the secondary effects that the ordinance was designed to prevent. Appellants further claim that under *Alameda Books,* the city bears the burden of production to come forward with evidence to reestablish the validity of its initial conclusion when the city's evidence is challenged either by evidence (1) showing the studies relied upon are invalid or unreliable, or (2) that reaches a conclusion contrary to the city's studies. Appellant's position is unavailing.

First, several courts have held that *Alameda Books* did not establish a "new" evidentiary standard, contrary to appellants' contention. In finding an ordinance was valid because the challengers failed to "cast sufficient doubt," the Eighth Circuit rejected the argument that *Alameda Books* changed the evidentiary standard. *SOB, Inc. v. County of Benton,* 317 F.3d 856, 864 (8th Cir.2003). The Eighth Circuit Court of Appeals noted

> Justice O'Connor, writing for the four-justice plurality in [*City of Erie v.] Pap's[A.M.*], afforded substantial deference to legislative judgments regarding secondary effects.
>
> . . . .
>
> *Alameda Books* was . . . deferential in reviewing a zoning ordinance which had a broader impact on protected First Amendment interests. Justice Kennedy's concurring opinion in *Alameda Books* was somewhat less deferential than the plurality to local legislative judgments as to the adverse secondary effects purportedly addressed by zoning regulations. But Justice Kennedy joined the plurality opinions in *Barnes [v. Glen Theatre, Inc.]* as well as [*Erie* ], and he did not even cite those cases in his *Alameda Books* concurrence, which means there is nothing to suggest that he has retreated from his votes in

> *Barnes* and [*Erie* ]. In these circumstances, we conclude that the Court's holding in [*Erie* ] is still controlling regarding the deference to be afforded local governments that decide to ban live nude dancing.

*SOB,* 317 F.3d at 863–64. Other courts have also held that *Alameda Books* did not create a new evidentiary burden and did not substantially change the second prong of the *Renton* test. *See Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 516 (4th Cir.2002) (noting that a "city or state need carry a minimal burden to demonstrate its interest in regulation of such activity"); *Baby Dolls Topless Saloons, Inc. v. City of Dallas,* 295 F.3d 471, 481 (5th Cir.2002) (citing *Alameda Books* and noting that a city is not required to demonstrate with empirical data that its ordinance will successfully lower crime); *Ben's Bar, Inc. v. Village of Somerset,* 316 F.3d 702, 721–22 (7th Cir.2003) (stating Justice Kennedy's concurrence in *Alameda Books* "agreed with the plurality's overall conclusion that a municipality's initial burden of demonstrating a substantial government interest in regulating the adverse secondary effects associated with adult entertainment is slight"). We likewise conclude that *Alameda Books* did not establish a "new" evidentiary standard.

Were this court to adopt appellants' reading of *Alameda Books,* whenever a prospective licensee casts *any* doubt on the municipality's evidence, the burden would shift to the municipality to supplement the record with evidence renewing support for a theory that justifies the ordinance. Parties to these cases would be on a never-ending merry-go-round of burden shifting. Thus, after careful review of *Alameda Books,* we conclude that the party challenging an ordinance must cast "*direct* doubt" on the municipality's rationale by showing the "municipality's evidence

does not support its rationale." *Alameda Books*, 535 U.S. at 438–39, 122 S.Ct. at 1736 (emphasis added). To cast direct doubt, the challenger must present evidence that is directly contrary to the municipality's evidence, not simply produce a general study refuting all secondary effects. This is not a new or heightened evidentiary standard as this interpretation is consistent with the holding in *Renton*, which established the proper evidentiary burden of the parties.

 Here, the city relied on relevant studies on the adverse secondary effects of sexually oriented businesses when it adopted Ordinance No. 92. The city used studies that described other cities' experiences as to adverse secondary effects of sexually oriented businesses, and reasonably believed that licensing regulations for sexually oriented businesses would serve to reduce potential secondary adverse effects. In addition, appellants did not produce evidence that cast direct doubt on the city's studies. Appellants merely claim that the studies relied on by the City amount to nothing more than "junk social science." But as the district court properly noted, it appears these same or similar studies were relied on and upheld in other cases, including *Jakes, Ltd., Inc. v. City of Coates*, 284 F.3d 884 (8th Cir.2002), *Renton*, and *Alameda Books*. In sum, appellants produced one article criticizing the research methods used by municipalities in secondary-effects studies and the prior testimony of a manager of a nude dancing club in an unrelated matter. As the district court aptly noted, the article [4] submitted by appellants was submitted in *SOB* in that party's unsuccessful attempt to overturn an ordinance. 317 F.3d at 863. General commentary criticizing adverse sec-

ondary effect studies is not enough to cast "direct doubt" on the city's rationale for the ordinance.

Because *Alameda Books* did not change the *Renton* evidentiary standard for determining whether an ordinance serves a "substantial government interest," and because Ordinance No. 92 meets the three-prong *Renton* test, we hold that Ordinance No. 92 is constitutional and accordingly affirm the decision of the district court.

## II

*Disqualification Provisions*

 Ordinance No. 92 authorizes the city to conduct background checks and to disqualify license applicants with certain criminal convictions and tax delinquencies. Appellants contend that such disqualification provisions are unlawful prior restraints in violation of the First Amendment. The city counters that disqualifications based on prior criminal convictions of certain crimes are valid, and notes that similar provisions have been upheld. The city further contends that the ordinance does not totally prohibit licensure based on prior convictions, but simply requires a waiting period before obtaining a license.

Section 5 of the ordinance provides, in relevant part, that licenses shall not be issued to individuals who have been convicted of certain enumerated sex crimes and where less than two years have elapsed since the date of conviction or release from confinement, if the conviction is a misdemeanor; and less than five years have elapsed since the date of conviction or release if the conviction is a felony; or if the individual has been convicted of multiple misdemeanors occurring within a 24–

---

4. Bryant Paul, et al., *Government Regulation of "Adult" Businesses Through Zoning and Anti–Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects*, 6 Comm. L. & Pol. 355 (2001).

month period. Several courts have upheld disqualifications based on past criminal convictions. *See DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 414–15 (6th Cir. 1997) (finding that the disqualification for a conviction of certain sexual offenses within the last five years is valid since the city officials' discretion is limited by objective criteria); *TK's Video, Inc. v. Denton County,* 24 F.3d 705, 709–10 (5th Cir.1994) (finding that disqualification for convictions for certain sexual offenses, and disclosure of such convictions, are valid since they are correlated with the side effects that can attend these businesses and the "ends and means are substantially related").

Appellants argue, however, that the Minnesota Supreme Court invalidated such restrictions in *Alexander v. City of St. Paul,* 303 Minn. 201, 227 N.W.2d 370 (1975). In *Alexander,* the city council revoked a theater license after an employee was convicted of selling, distributing or exhibiting an obscene motion picture. *Alexander,* 303 Minn. at 203, 227 N.W.2d at 372. The Minnesota Supreme Court noted that expression by means of motion pictures is included within the First and Fourteenth Amendments. *Id.* The court also noted that "the standards for excluding persons from engaging in the licensed activity must bear a reasonable relationship to their qualifications to engage in that activity." *Id.* In finding the ordinance unconstitutional, the court noted that because the city was licensing a motion picture theater, "it is licensing an activity protected by the First Amendment, and as a result the power of the city is more limited than when the city licenses activities which do not have First Amendment protection." *Id.* at 227, 227 N.W.2d at 373–74. Of particular significance to our

analysis here, the court also held that revoking a license for a past conviction related to obscenity denies the person the ability to exercise a constitutionally protected right because of a past abuse of that right. *Id.* at 206, 227 N.W.2d at 373.

But *Alexander* is distinguishable on several grounds. First, *Alexander* involved the licensure of motion picture theaters—a category of expression not subject to the limiting language used by the Supreme Court in analyzing nude dancing ordinances.[5] *See Jacobellis,* 378 U.S. at 187, 84 S.Ct. at 1677 (motion pictures are within the ambit of constitutional guarantees of freedom of speech and of the press). The case law is clear that nude dancing receives a lesser degree of First Amendment protection than adult films. *Barnes,* 501 U.S. at 566, 111 S.Ct. at 2457. Secondly, Ordinance No. 92 does not deny a license for a past abuse of a constitutionally protected right, such as showing motion pictures. Rather, the city's ordinance temporarily denies a person a license for a past conviction of certain enumerated sex-crimes, such as prostitution. In addition, the city's ordinance sufficiently limits the decision-maker's discretion because the ordinance contains objective criteria enumerating the disqualifying sex crimes and limiting the period of disqualification by the severity of the crime.

Because similar disqualification provisions have been upheld and the disqualification provisions are substantially related to the city's significant governmental interest, we affirm.

## III

*Disclosure Provisions*

Appellants also argue that the disclosure requirements in Ordinance No. 92 consti-

---

**5.** Similarly, many of the other cases cited by appellants also involved adult motion picture establishments or adult bookstores—businesses also not subjected to the nude dancing constitutional standard.

tute a prior restraint on freedom of expression.[6] The city counters that other courts have held that disclosure requirements in similar ordinances are valid.

 Many other courts have upheld similar disclosure requirements. *See TK's Video,* 24 F.3d at 710 (upholding the disclosure requirement, including names, ages, and prior criminal histories); *Ellwest Stereo Theater, Inc. v. Boner,* 718 F.Supp. 1553, 1566–68 (M.D.Tenn.1989) (upholding disclosure requirement as to persons operating and managing the adult-oriented businesses, but finding the disclosure requirement as to their criminal convictions was overbroad); *Broadway Books, Inc. v. Roberts,* 642 F.Supp. 486, 493 (E.D.Tenn. 1986) (upholding disclosure requirement, including criminal records). In order for the city to compel disclosure, "it is necessary that there be a substantial relationship between the information sought to be disclosed and a significant governmental interest to be furthered by such disclosure." *Ellwest Stereo Theater,* 718 F.Supp. at 1567. The Fifth Circuit noted that requiring owners and employees to disclose information about their age, prior regulatory infractions, and sexual offenses, "substantially relates to the substantial government interest of curtailing pernicious side effects of adult businesses." *TK's Video,* 24 F.3d at 710.

The city has a "significant governmental interest" that is furthered by the disclosures required in the ordinance. The purpose of the ordinance is to "guard against the inception and transmission of disease" and to guard against the secondary effects of sexually oriented businesses. And, as the Fifth Circuit noted, disclosing information about owners' and employees' ages, prior regulatory infractions and sexually related criminal convictions substantially relates to the city's interests in guarding against the secondary effects of sexually oriented businesses.

Because similar disclosure requirements have been upheld, and because the disclosure requirements are substantially related to the city's significant governmental interest, we affirm.

## IV

*License Fee Provisions*

 Appellants also argue that the license fee (of $5,000) and the investigation fee (of $1,500) are unconstitutional prior restraints on First Amendment rights. Appellants acknowledge that the city may impose a fee, but, citing *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), contend that licensing fees on adult entertainment must be reasonably related to recouping the costs of administering the licensing program. Appellants also argue that following the Supreme Court's decision in *Alameda Books,* the municipality bears the burden of proving the reasonableness of the fees. The city counters that the license fee in the ordinance is valid and notes that the Eighth Circuit has held that the prospective licensee has the burden of proving the license fee is unreasonable. The city also argues that appellants have produced no evidence showing the fee is unreasonable or content-based.

 Distinguishing core First Amendment cases such as *Murdock,* which involved the right to distribute religious leaf-

---

**6.** A prospective operator of a sexually oriented business is required to execute an application form which requires applicants to disclose: their name, and any name used in the prior five years, current business address, fin-

gerprints or social security number, name and address of the proposed business, proof of age, and information on any other licenses to operate sexually oriented businesses and the status of such licenses.

lets, the Eighth Circuit in *Jake's* held that because nude dancing is only marginally protected by the First Amendment, adult entertainment license fees need not be reasonably related to recouping the costs of administering the licensing program. *Jake's*, 284 F.3d at 891. In addition, the *Jake's* court noted that the "prospective licensee has the burden of establishing that a license fee is unreasonable"; however, a "fee may be so large or so discriminatory as to demonstrate that it is not content-neutral." *Id.* And, as noted earlier in this opinion, *Alameda Books.* which was decided approximately six weeks after *Jake's*, did not change the evidentiary standard municipalities must meet to satisfy the "substantial governmental interest" test. By logical extension, nothing in *Alameda Books* shifts the burden to municipalities to establish the reasonableness of the license fee.

Nevertheless, appellants point to the Eleventh Circuit Court of Appeals, which has held that

> when core First Amendment freedoms are made subject to a licensing scheme, only revenue-neutral fees may be imposed so that government is not charging for the privilege of exercising a constitutional right ... [and] it is the government's burden to demonstrate that its licensing fee is reasonably related to recoupment of the costs of administering the licensing program.

*Fly Fish, Inc. v. City of Cocoa Beach,* 337 F.3d 1301, 1314 (11th Cir.2003) (citation omitted). The Eleventh Circuit also noted that at least one other circuit and several federal district courts have adopted the same analysis on licensing fees on adult entertainment businesses. *Id.* (citing *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville,* 274 F.3d 377, 395 (6th Cir.2001); *Kentucky Rest. Concepts, Inc. v. City of Louisville,* 209 F.Supp.2d 672, 691–692

(W.D.Ky.2002); *AAK, Inc. v. City of Woonsocket,* 830 F.Supp. 99, 105 (D.R.I. 1993); *Ellwest Stereo Theater,* 718 F.Supp. at 1574; *Bayside Enters., Inc. v. Carson,* 450 F.Supp. 696, 704–705 (M.D.Fla.1978)). Appellants urge us to adopt the Eleventh Circuit's analysis. We decline to do so.

Instead, we adopt the Eighth Circuit's analysis regarding licensing fees for businesses that offer nude dancing because, as noted above, nude dancing receives a lesser degree of First Amendment protection. Thus, prospective licensees have the burden of proving that the fees are unreasonable. In adopting the Eighth Circuit's analysis, we acknowledge, as did the *Jake's* court, that an adult entertainment license fee may be "so large or so discriminatory as to demonstrate that it is not content neutral." *Jake's*, 284 F.3d at 891. But here, appellants have not met their burden to show that the fees are unreasonable. The district court and the city noted that the appellants produced no evidence showing the fee is unreasonable, other than arguing that the fees are unreasonable because they are substantially higher than license fees in other cases. Although we acknowledge that the fees here are high, we cannot say that they are so large or discriminatory as to demonstrate that they are not content neutral.

## V

*Distance Restrictions and Prohibition Against Gratuities*

Finally, appellants challenge the provisions in Ordinance No. 92 prohibiting any dancer from receiving gratuities and requiring dancers to be no closer than six feet from any patron. Appellants argue that the distance requirements create so-called "floating buffer zones" and note that these buffer zones have been invalidated by the United States Supreme Court. Appellants also contend that the

dancers should be allowed to accept gratuities since the Supreme Court (in other contexts) has invalidated such financial disincentives to engage in constitutionally protected speech. The city counters that the distance restrictions are nearly identical to restrictions that other courts have upheld, and contends that the First Amendment protects neither the desire to dance within a certain distance nor the opportunity to receive tips. Finally, the city argues that the ordinance has a fixed buffer zone, not a floating buffer zone as appellants argue.

Section 18 of the ordinance requires that performers maintain a six-foot distance from customers while performing on a platform raised two feet from the floor where the customers sit. Section 18 also limits the manner in which dancers may solicit or accept gratuities. Several circuits have upheld similar behavioral (distance and gratuity) restrictions on dancers as reasonable, content-neutral time, place, and manner restrictions. *See Jake's,* 284 F.3d at 891–92 (six feet and no tips); *Deja Vu of Nashville,* 274 F.3d at 396–98 (three feet and finding there is no constitutional requirement that compensation come in the form of tips); *Colacurcio v. City of Kent,* 163 F.3d 545, 553 (9th Cir.1998) (ten feet), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1553, 146 L.Ed.2d 459 (2000); *Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1061–62 (9th Cir.1986) (ten feet and no tips).

Appellants argue, however, that similar distance restrictions have been held unconstitutional. In support of their position, appellants point us to *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), where the Supreme Court struck down a so-called "floating buffer zone" that required abortion protesters to remain 15 feet from the abortion clinic doorway and driveway entrances. The Su-

preme Court invalidated floating buffer zones in the abortion protest context because proximity was essential to the type of expression the protesters sought to protect. *Id.* at 377–78, 117 S.Ct. at 867. The protesters in *Schenck* attempted to persuade patients to reconsider their decision as they approached the entrance to the clinic. *Id.* It was difficult, if not impossible, to speak in a conversational manner with patients and simultaneously comply with the distance requirements. *Id.* The court concluded that the injunction lacked precision and burdened more speech than necessary. *Id.* at 380, 117 S.Ct. at 868. Appellants argue that, in a similar fashion, the entertainers will dance further away from patrons in order to assure they do not inadvertently violate the distance restrictions. The flaw in appellants' argument is that Ordinance No. 92 is not a "floating buffer zone" as described in *Schenck.* Unlike the distance restriction in *Schenck,* the distance restriction in Ordinance No. 92 is well defined, and is confined to the "platform" where the performers may provide the entertainment. Furthermore, close proximity is not an essential element of nude dancing because the expressive content of such dancing does not depend on being at "a normal conversational distance," as appellants imply. As the district court aptly noted, "[w]hatever constitutionally protected aspects there are in nude dancing would seem to be preserved from a distance of six feet as well as six inches."

Because the distance restriction is well defined and sufficiently narrow, we affirm.

## DECISION

The district court correctly concluded that Ordinance No. 92 is constitutional because nude dancing receives a lesser degree of First Amendment protection than adult films or books, and because the ordi-

nance meets the three-prong *Renton* test. Accordingly, we affirm the district court's grant of summary judgment to the City of Elko. In addition, we affirm the district court's grant of summary judgment to the City of Elko with respect to the disqualification and disclosure provisions because they are substantially related to the city's significant governmental interest. We also affirm the district court's grant of summary judgment to the City of Elko with respect to the license and investigation fees because appellants did not meet their burden to show the fees are unreasonable, and because the fees are not so large as to demonstrate that they are not content neutral. Finally, we affirm the district court's grant of summary judgment with respect to the distance restrictions and prohibition against gratuities because the distance restrictions are well defined and narrowly drawn and do not burden more "speech" than is necessary.

**Affirmed.**

G. BARRY ANDERSON, Judge (concurring specially).

I agree with the majority regarding the disposition of this appeal but concur specially because I do not believe that the activity at issue here is protected by the First Amendment.

In *U.S. v. O'Brien*, four men burned their Selective Service registration certificates in violation of the Universal Military Training and Service Act to encourage "others to adopt [their] antiwar beliefs." 391 U.S. 367, 369–70, 88 S.Ct. 1673, 1675, 20 L.Ed.2d 672 (1968). The men were prosecuted for this violation; their defense was that it was protected "symbolic speech" because they intended to convey an idea. *Id.* at 376, 88 S.Ct. at 1678. In rejecting this argument, the Court stated, "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* When analyzing restrictions on so-called symbolic speech, the Court enumerated a four-part test, all parts of which must be satisfied for the legislation to be constitutional: (1) the government making the law must have the constitutional authority to do so, (2) the law must serve "an important or substantial governmental interest," (3) the interest must not be related to the suppression of free expression, and (4) the incidental restriction on expression must be no more than is necessary to achieve the governmental interest. *Id.* at 377, 88 S.Ct. at 1679.

Four years later, in *California v. LaRue*, the Supreme Court stated that nude dancing is entitled to some constitutional protection, but observed that this form of "live entertainment" "partake[s] more of gross sexuality than of communication." 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342 (1972). In *Schad v. Borough of Mount Ephraim*, the Court stated, "Entertainment, as well as political and ideological speech, is protected"; the Court continued that "an entertainment program" may not "be prohibited solely because it displays the nude human figure." 452 U.S. 61, 65–66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981).

The meaning of *LaRue* and *Schad* was clarified in *Barnes v. Glen Theatre, Inc.* where the Supreme Court noted, "[N]ude dancing ... is expressive conduct within the outer perimeters of the First Amendment." 501 U.S. 560, 565–66, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991). Unfortunately, the Supreme Court has recently reiterated this position, noting that nude dancing is "expressive conduct" falling "within the outer ambit of the First Amendment's protection." *City of Erie v.*

*Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000).

But the better position, and the position that does not necessitate the intellectual gymnastics created by an attempt to find what the "outer ambit" of the First Amendment means, is the position articulated by Justice Scalia in his *Barnes* concurrence where he correctly argued that statutes and ordinances prohibiting or restricting erotic dancing are "not subject to First Amendment scrutiny at all." *Barnes* at 572, 111 S.Ct. at 2463 (Scalia, J., concurring). Justice Scalia noted that there is a long history in American law of prohibiting public nudity, and it is a recent development that such laws have been thought to have First Amendment implications. *Id.* at 572–73, 111 S.Ct. at 2464.

It is difficult, and ultimately a useless task, to attempt to define the "outer ambit" of the First Amendment that protects erotic dancing. The better approach is to recognize that erotic dancing is solely conduct and not entitled to First Amendment protection.